UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GLOCK, INC.,                          :

     Plaintiff,                      :
                             CIVIL ACTION NO.
v.                                   :
                             1:12-CV-136-MHS
GLOBAL GUNS & HUNTING,                :
INC. d/b/a OMB Guns, et al.,
                      :

     Defendants.

## ORDER

This action is before the Court on plaintiff's motion for summary judgment [Doc. 153], defendants' motion for partial summary judgment [Doc. 152], defendants' motion to strike [Doc. 167], and defendants' motion to set time certain deadline for providing amended responses and to defer ruling on pending motions [Doc. 175].[1] The Court's rulings are set out below.

Background

Plaintiff Glock, Inc. ("Glock"), filed this action against defendant Global Guns & Hunting, Inc. d/b/a OMB Guns ("OMB"), on January 13, 2012. The

---

[1] Defendants have withdrawn their motion for stay [Doc. 171], rendering moot plaintiff's motion for leave to file a supplemental memorandum in opposition to the motion [Doc. 174].

complaint alleged that from 2008 through 2010 OMB had purchased discounted law enforcement pistols pursuant to a series of Law Enforcement Sales Agreements ("LE Agreements") with Glock and then sold the pistols to the commercial market in violation of those agreements. Compl. [Doc. 1] ¶¶ 30-59. Glock asserted claims against OMB for breach of contract, unjust enrichment, conversion, theft by conversion, theft by deception, declaratory judgment, constructive trust, equitable lien, and an accounting. *Id.* ¶¶ 60-95.

On February 3, 2012, OMB filed its answer together with a counterclaim containing two counts. In Count I of its counterclaim, OMB alleged that Glock had breached the 2010 LE Agreement by unilaterally restricting OMB's geographic territory to less than the entire United States. Countercl. [Doc. 2] ¶¶ 2-7. In Count II, OMB alleged that Glock had breached a March 2011 letter agreement by refusing to honor orders from law enforcement agencies based on quotes made by OMB before December 31, 2010. *Id.* ¶¶ 8-12.

On December 18, 2012, Glock filed a motion for leave to file an amended complaint adding John Ralph III, owner of OMB, as a defendant and asserting new claims for fraud and deceit, cybersquatting, federal trademark counterfeiting and infringement, and violations of Georgia's

2

Racketeer Influenced and Corrupt Organizations ("RICO") Act. Proposed Am. Compl. [Doc. 72-1] ¶¶ 3, 69-78, 224-315. The new claims were based on allegations that Ralph and OMB improperly (1) diverted LE pistols and magazines for resale to the commercial market, (2) diverted specially priced LE pistols that were intended for sale to a specific law enforcement agency to other purchasers, (3) sold sales sample pistols that should have been retained for use by law enforcement agencies for testing and evaluation purposes, and (4) sold thousands of dollars' worth of promotional items that should have been given away to customers without charge to promote the sale of Glock products. *Id.* ¶¶ 82-123. The amended complaint further alleged that OMB and Ralph bribed two Glock executives, Craig Dutton and Bo Wood, by making payments to their wives, Lisa Dutton and Paula Wood, so they would facilitate and conceal OMB's schemes to convert law enforcement pistols, specially priced pistols, sales sample pistols, and promotional items. *Id.* ¶¶ 124-136. Finally, the amended complaint alleged that OMB and Ralph registered at least sixteen Internet domain names using the federally registered trademark "Glock" and sold counterfeit merchandise bearing Glock's federally registered logo without Glock's permission. *Id.* ¶¶ 137-188.

3

On February 22, 2013, OMB filed a motion for stay of proceedings in this case pending completion of an ongoing federal criminal investigation of Ralph's alleged payment of bribes to Craig Dutton and Bo Wood. On April 23, 2013, the Court denied the motion. Meanwhile, on February 25, 2013, the Court granted Glock's motion for leave to file an amended complaint. On March 21, 2013, OMB filed its answer to the amended complaint and reasserted the same two-count counterclaim. The Court subsequently denied OMB's motion for leave to file an amended counterclaim.

On April 23, 2013, Ralph filed a motion to dismiss the amended complaint or for more definite statement. On June 3, 2013, the Court denied the motion. Ralph filed his answer to the amended complaint on June 17, 2013.

On March 6, 2014, following completion of discovery, Glock filed a motion for summary judgment on all claims raised in the amended complaint and on OMB's counterclaim. On the same date, defendants filed a motion for partial summary judgment on Glock's claims for conversion, theft by conversion, and theft by deception.

On June 4, 2014, a grand jury sitting in the United States District Court for the District of Kansas indicted defendant Ralph, Craig and Lisa

4

Dutton, and Bo and Paula Wood on conspiracy, wire fraud, and money laundering charges. *United States v. Ralph*, Case No. 5:14-cr-40066-DDC (D. Kan. Jun. 4, 2014). The indictment alleged that Ralph paid kickbacks and bribes to Craig Dutton and Bo Wood, through companies formed by Lisa Dutton and Paula Wood, in exchange for OMB receiving preferential treatment over other firearms distributors.

On June 16, 2014, defendants filed a motion to strike Glock's reference to the indictment in its reply brief in support of its motion for summary judgment. On July 22, 2014, defendants filed a motion for a stay all proceedings in this case until conclusion of the criminal trial in the Kansas district court.

On January 29, 2015, defendant Ralph pled guilty to Count I of the indictment.[2] On February 3, 2015, defendants filed a motion withdrawing their motion for a stay and asking the Court to defer ruling on the motions for summary judgment, to allow 45 days for defendants to amend the discovery responses to which defendant Ralph had previously asserted his Fifth Amendment privilege against self-incrimination, and to allow the

---

[2] In light of Ralph's guilty plea, the Court denies as moot defendants' motion to strike Glock's reference to the indictment in its reply brief in support of its motion for summary judgment.

parties to amend their motions for summary judgment based on the new factual information in the amended discovery responses.

Discussion

I.     Defendants' Motion to Set Time Certain Deadline for Providing Amended Responses and to Defer Ruling on Pending Motions

Defendants argue that in light of defendant Ralph's guilty plea, he is now obligated to supplement the discovery responses in which he previously asserted his Fifth Amendment privilege against self-incrimination. In the interest of "fairness and justice," defendants ask the Court to defer ruling on the pending motions for summary judgment until the discovery responses have been amended, to allow them 45 days to provide the amended responses, and to allow the parties to amend their summary judgment motions based on the new information provided. Mot. to Amend [Doc. 175] at 9-10. In response, Glock argues that defendant Ralph is under no obligation to amend discovery responses in which he previously asserted his Fifth Amendment privilege; that the duty to supplement discovery responses cannot be used to introduce evidence that was previously withheld for tactical reasons; and that once a party has asserted his Fifth Amendment privilege, he cannot waive it

6

and seek to use the information withheld in his own defense.  For the following reasons, the Court denies defendants' motion.

First, defendant Ralph is under no obligation to supplement discovery responses in which he invoked his Fifth Amendment privilege.  Rule 26(e) of the Federal Rules of Civil Procedure requires a party to "supplement or correct" a discovery response if he "learns" that it is "incomplete or incorrect" in some material respect.  Fed. R. Civ. P. 26(e)(1)(A).  Defendant Ralph does not claim to have learned that his previous discovery responses were incomplete or incorrect in any respect.  Instead, he seeks to produce information that was in his possession all along, but that he previously refused to disclose out of fear of incriminating himself.  Now that he has pled guilty to the criminal charges, defendant seeks to use the previously withheld information to bolster his defense in this civil case, citing Rule 26(e) in support.  Defendants' argument, however, stands Rule 26(e) on its head.  The rule is intended to ensure timely disclosure of relevant information, not to permit a party to withhold information for self-interested reasons and then disclose it only when such disclosure becomes advantageous.

Second, it is well-settled that "[t]he Fifth Amendment cannot be invoked to oppose discovery and then tossed aside to support a party's

7

assertions." *Sec. & Exch. Comm'n v. Zimmerman*, 854 F. Supp. 896, 899 (N.D. Ga. 1993) (citations omitted). In *Zimmerman*, the Securities and Exchange Commission ("SEC") brought suit against Zimmerman and a co-defendant alleging violations of the securities laws. *Id.* at 897. Zimmerman asserted his Fifth Amendment privilege in response to each question and discovery request propounded by the SEC, citing a related ongoing criminal investigation. *Id.* at 898. However, he stated that, depending on the outcome of the investigation, he might decide to waive his privilege and testify. *Id.* at 898-99.

The court rejected Zimmerman's attempt to preserve his right to testify, noting that he "has waited until after the SEC has already filed a motion for summary judgment to make his decision as to whether to stay silent or not." *Id.* at 899. "By waiting," the court continued, "the defendant has made his decision. Zimmerman may not use, therefore, any evidence which he has withheld by his invocation of his testimonial privilege in this matter." *Id.*; *see also In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991) ("[T]he Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion."); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d

8

553, 577 (1st Cir. 1989) ("A defendant may not use the fifth amendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial."); *Traficant v. Comm'r of Internal Revenue Serv.*, 884 F.2d 258, 265 (6th Cir. 1989) (limits on introducing evidence on matter as to which defendant had invoked privilege against self-incrimination were "properly within the scope of cases holding that a party to civil litigation or other non-criminal proceedings may encounter costs imposed in exchange for the assertion of the Fifth Amendment privilege as long as they are not so high as to force abandonment of the privilege"); *Sec. & Exch. Comm'n v. Global Express Capital Real Estate Inv. Fund I, LLC*, No. 2:03-cv-01514-KJD-LRL, 2006 WL 7347289, at *14 (D. Nev. Mar. 28, 2006), *aff'd in part, rev'd in part, and remanded on other grounds*, 289 F. App'x 183 (9th Cir. 2008) ("[U]se of the privilege as a 'shield' against discovery precludes the use of undiscoverable information as a 'sword' in response to summary judgment or at trial to assert any defenses."); *Pack v. Byer*, 157 F.R.D. 219, 224 (D. N.J. 1993) ("[P]arties which assert the Fifth Amendment privilege are precluded from later waiving the privilege and utilizing the evidence."); *United States v. Sixty Thousand Dollars ($60,000,00) in United States Currency*, 763 F. Supp. 909, 914 (E.D. Mich.

9

1991) ("Because claimant has asserted a fifth amendment claim in discovery, this court holds that he may not now waive the privilege and testify."); *Sec. & Exch. Comm'n v. Benson*, 657 F. Supp. 1122, 1129 (S.D. N.Y. 1987) ("By hiding behind the protection of the Fifth Amendment as to his contentions, [defendant] gives up the right to prove them."); *Sec. & Exch. Comm'n v. Cymaticolor Corp.*, 106 F.R.D. 545, 550 (S.D. N.Y. 1985) ("In light of the defendant's invocation of his fifth amendment rights regarding the basis of his defenses and denials, a total preclusion order is appropriate."); *Duffy v. Currier*, 291 F. Supp. 810, 815 (D. Minn. 1968) ("The court would not tolerate nor indulge a practice whereby a defendant by asserting the privilege against self-incrimination during pre-trial examination and then voluntarily waiving the privilege at the main trial surprised or prejudiced the opposing party.")

Defendants argue that *Zimmerman* is distinguishable because, unlike Zimmerman, Ralph was indicted. But Ralph was not indicted until after discovery in this case had closed and summary judgment motions had been filed. At the time he invoked his Fifth Amendment privilege in response to Glock's discovery requests and deposition questions, Ralph, like Zimmerman, was the subject of a criminal investigation but had not yet been indicted. Therefore, as with Zimmerman, the fact that Ralph faced "the dilemma of

choosing silence or presenting a defense" did not violate the Fifth Amendment. *Id.* at 899.

Defendants also argue that cases holding the Fifth Amendment cannot be used as a shield during discovery and then discarded for the purpose of presenting evidence either at trial or on summary judgment are inapplicable because defendant Ralph "is seeking to actively participate in the discovery process and not hide behind the Fifth Amendment 'shield' to later present withheld evidence as a 'sword' in opposition or support of summary judgment or [at] trial." Defs.' Reply Br. [Doc. 177] at 8. But defendant Ralph's willingness to amend his discovery responses now that he no longer needs the protection of the Fifth Amendment is no different than Zimmerman's willingness, if he decided to testify, to make himself available for deposition and respond to discovery requests to which he had previously asserted his Fifth Amendment privilege. *Zimmerman*, 854 F. Supp. at 899. Just as in *Zimmerman*, by waiting until after discovery was completed and summary judgment motions were filed to decide to waive the privilege, defendant Ralph "has made his decision" and "may not use, therefore, any evidence which he has withheld by his invocation of his testimonial privilege in this matter." *Id.*

11

Finally, defendants rely on the Georgia Court of Appeals' decision in *Kickasola v. Jim Wallace Oil Co.*, 242 S.E.2d 483 (Ga. Ct. App. 1978). In *Kickasola*, the court held that a defendant's entry of a guilty plea in a criminal case did not prevent him from explaining the reasons for the plea in a related civil proceeding. 242 S.E.2d at 486. There was no evidence, however, that the defendant had withheld relevant evidence from the plaintiff during discovery based on his Fifth Amendment privilege. In this case, on the other hand, there is no contention that Ralph's entry of a guilty plea precludes his testifying regarding the reasons for the plea. Rather, it is Ralph's previous invocation of the Fifth Amendment and refusal to respond to discovery requests that precludes his attempt to present evidence now that he previously withheld. Accordingly, *Kickasola* has no relevance here.

II.     Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the Supreme Court held that this burden could be met if the moving party demonstrates "that there is an absence of evidence to support the non-moving

party's case." *Id.* at 325. At that point the burden shifts to the non-moving party to go beyond the pleadings and present specific evidence giving rise to a triable issue. In reviewing a motion for summary judgment, the Court must construe all factual inferences in the light most favorable to the non-moving party. *Palmer v. BRG of Georgia, Inc.*, 874 F.2d 1417, 1422 (11th Cir. 1989). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).

The Rule 56 standard is not affected by the filing of cross-motions for summary judgment. "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720 at 335-36 (3d ed. 1998). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *See United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984).

13

III. Defendants' Motion for Partial Summary Judgment[3]

Glock seeks to recover damages from both defendants for their allegedly improper sales of LE pistols and magazines, specially priced pistols, sales samples pistols, and promotional items based on five causes of action: conversion (Count III), theft by conversion (Count IV), theft by deception (Count V), fraud and deceit (Count VI), and violation of Georgia's RICO Act (Count IX). Based on the same allegations, Glock also asserts two additional causes of action solely against OMB: breach of contract (Count I) and unjust enrichment (Count II).

Defendants move for partial summary judgment as to Glock's claims for conversion (Count III), theft by conversion (Count IV), and theft by deception (Count V). Defendants argue that Glock's claims for conversion and theft by conversion must fail for two reasons: first, Glock had no property interest in the items when they were allegedly converted because they became OMB's property at the time they were shipped by Glock; and, second, both claims are

---

[3] Glock argues that defendants' motion should be summarily denied because they failed to file a separate statement of undisputed material facts as required by Local Rule 56.1B(1). However, defendants included in their motion a separate section entitled "Undisputed Facts," in which they set out Glock's responses to certain requests for admission. The Court finds that this statement, as a separate part of the motion itself, sufficiently complies with the local rule.

14

based solely upon an alleged breach of contract. Defendants also argue that Glock's claims for theft by conversion and theft by deception must fail because they improperly seek recovery under criminal statutes.

In response, Glock has voluntarily withdrawn its claim for common law conversion but opposes dismissal of its claims for theft by conversion and theft by deception. Glock argues that, unlike common law conversion, theft by conversion does not require the plaintiff to have an interest in the property at the time it is converted. Glock also contends that the theft by conversion claim differs from the breach of contract claim because of defendants' alleged fraudulent intent in obtaining the converted items from Glock. Finally, Glock argues that Georgia law expressly provides a private cause of action in tort for theft by conversion and theft by deception, and that both are predicate acts for purposes of the Georgia civil RICO Act, which also provides a private civil remedy.

The Court concludes that defendants are entitled to summary judgment on all three claims. Glock concedes that OMB obtained title to the allegedly converted items when they were shipped by Glock. Therefore, it is undisputed that Glock retained no ownership interest in the items at the time of defendants' allegedly improper sales. Glock acknowledges that this fact is

AO 72A
(Rev.8/82)

fatal to its common law conversion claim. Glock's arguments that its claims for theft by conversion and theft by deception nonetheless survive are without merit.

"A person commits the offense of theft by conversion when, having lawfully obtained . . . property of another . . . under an agreement . . . to make . . . a specified disposition of such property, he knowingly converts the . . . property to his own use in violation of the agreement . . . ." O.C.G.A. § 16-8-4. Glock alleges that defendants committed theft by conversion by selling LE pistols and magazines, specially priced pistols, sales samples pistols, and promotional items in violation of their agreements with Glock. Am. Compl. ¶¶ 211-214. Contrary to Glock's argument, however, theft by conversion, like common law conversion, requires a showing that the defendant converted the "property of another" to his own use. O.C.G.A. § 16-8-4; *see Mullis v. Walker*, 7 B.R. 563, 565 (Bankr. M.D. Ga. 1980) ("Under the statute, and case law associated therewith, it is essential to show a conversion of another's property to the defendant's own use in order to fit within the definition of Theft by Conversion (Georgia's equivalent of embezzlement).") Since Glock admits that it retained no ownership interest in the property at the time of

16

defendants' allegedly improper sales, its claim for theft by conversion will not lie.

"A person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." O.C.G.A. § 16-8-3(a). Glock alleges that defendants committed theft by deception by obtaining LE pistols and magazines, specially priced pistols, sales samples pistols, and promotional items from Glock "with the intent to resell" such property in violation of defendants' agreements with Glock. Am. Compl. ¶¶ 218-221. Thus, Glock's claim is based on the contention that defendants falsely promised to resell (or, in the case of promotional items, give away) the property in accordance with their agreements with Glock. Under Georgia law, however, "a false promise of future performance cannot be the basis for a conviction [of theft by deception]." *Robinson v. State*, 401 S.E.2d 621, 623 (Ga. Ct. App. 1991) (citation omitted); *see also Elliott v. State*, 254 S.E.2d 900, 901 (Ga. Ct. App. 1979); *Croy v. State*, 211 S.E.2d 183, 185 (Ga. Ct. App. 1974). Therefore, Glock's claim for theft by deception must also fail.

Glock's reliance on O.C.G.A. § 51-10-6 is misplaced. That Code section provides property owners a private right of action "to recover damages from

17

any person . . . who commits a theft as defined in Article I of Chapter 8 of Title 16 involving the owner's personal property." O.C.G.A. § 51-10-6(a). For the reasons discussed above, Glock's complaint fails to state a viable claim against defendants for either theft by conversion or theft by deception. Therefore, no private right action arises under this statute.

IV.     Glock's Motion for Summary Judgment

Glock moves for summary judgment on all of its claims, as well as on OMB's counterclaim.[4]  For the reasons explained in the preceding section, defendants, rather than Glock, are entitled to summary judgment on Glock's claims for theft by conversion and theft by deception. The Court addresses Glock's motion as to each of its remaining claims and OMB's counterclaim below.

A.     Breach of Contract (Count I)

Glock alleges that OMB breached its agreements with Glock by (1) diverting LE pistols and magazines for resale to the commercial market,

---

[4] Although Glock moved for summary judgment "on all claims raised in the Amended Complaint," Glock's Notice of Mot. for Summ. J. [Doc. 153] at 1, as noted above, Glock has withdrawn its claim for common law conversion. In addition, Glock's motion does not address its claims for a constructive trust (Count X) and an equitable lien (Count XI). Therefore, the Court deems these claims to have been abandoned.

(2) diverting specially priced LE pistols that were intended for sale to a specific law enforcement agency to other purchasers, (3) selling sales sample pistols that should have been retained for use by law enforcement agencies for testing and evaluation purposes, and (4) selling promotional items that should have been given away to customers without charge to promote the sale of Glock products. Am. Compl. [Doc. 90] ¶¶ 191-194. Each of these claims is addressed separately below.

1.     LE Pistols and Magazines

Glock and OMB entered into an LE Agreement and a Commercial Distributor Agreement ("Commercial Agreement") for each of the calendar years from 2008 to 2010. Compl. [Doc. 1], Exs. 1-A to 1-C & 2-A to 2-C. Paragraphs 3A, 8A, and 24 of the LE Agreements provided that OMB would not resell discounted LE pistols to the commercial market without Glock's prior written authorization. *Id.* Paragraph 6A of both the LE and Commercial Agreements provide that the agreements "shall only be altered or modified in writing and must be signed by the parties authorized to bind either side." *Id.*

In support of its motion for summary judgment on this claim, Glock submitted evidence purportedly showing that, contrary to these provisions,

OMB sold at least 14,525 LE pistols to the commercial market without written authorization, resulting in damages to Glock of $783,616. Glock's Statement of Undisputed Material Facts (hereinafter, "Glock's Facts") [Doc. 153-1] ¶¶ 153, 155. Glock also submitted evidence purportedly showing that 12,756 of the 14,525 LE pistols OMB diverted to the commercial market were Gen3 models that came with three magazines when sold to the LE market but only two when sold to the commercial market. *Id.* ¶¶ 14, 156. Glock submitted evidence purportedly showing that the standard price at which Glock sells extra magazines is $17, and that defendants removed the third magazine from the diverted Gen3 pistols and sold them separately, resulting in an additional $216,852 in damages to Glock. *Id.* ¶¶ 156-159.

In response, defendants do not dispute that Glock and OMB were parties to the 2008-2010 LE and Commercial Agreements. Nor do defendants dispute that, contrary to the terms of the agreements, OMB diverted a number of LE pistols and magazines to the commercial market without Glock's prior written authorization. Instead, defendants argue that the written contracts were modified by an oral agreement between defendant Ralph and Glock Vice President Gary Fletcher and by the parties' course of conduct. Specifically, defendants contend that in order to expedite the

delivery of guns, Fletcher agreed that OMB could re-label guns originally labeled for either the LE or commercial markets and deliver them to the other market to fill customers' orders as needed. Ralph Aff. [Doc. 160] ¶¶ 30, 33. To facilitate this agreement, defendants contend, Fletcher authorized Glock to deliver a label machine to OMB so that OMB could re-label guns in its inventory from commercial to LE and vice versa and directed Glock employees to travel to OMB's headquarters to set up the label machine and provide training to OMB employees on the re-labeling of guns. *Id.* ¶¶ 34, 36. Thereafter, according to defendants, OMB adopted a company-wide policy consistent with Glock's approval concerning the re-labeling of guns, and this re-labeling course of conduct continued from 2008 through 2011 with Fletcher's and Glock's knowledge and approval. *Id.* ¶¶ 37, 39.

Contractual provisions requiring modifications to be in writing are valid and enforceable, but "waiver of such a written modification requirement in a contract may be established by the parties' course of conduct." *Handex of Fla., Inc. v. Chatham Cnty.*, 602 S.E.2d 660, 663 (Ga. Ct. App. 2004). However, "the law will not infer the waiver of an important contract right unless the waiver is *clear and unmistakable*." *Vratsinas Constr. Co. v. Triad Drywall, LLC*, 739 S.E.2d 493, 496 (Ga. Ct. App. 2013) (internal quotation

21

marks omitted) (footnote omitted) (emphasis in original). "And because waiver is not favored under the law, the evidence relied upon to prove a waiver must be so clearly indicative of an intent to relinquish a then known particular right or benefit as to exclude any other reasonable explanation." *Id.* (internal quotation marks omitted) (footnote omitted). "The burden of proof lies with the party asserting waiver and, although generally a jury question, when the facts and circumstances essential to the waiver issue are clearly established, waiver becomes an issue of law." *Id.* (internal quotation marks omitted) (footnote omitted).

In this case, the evidence is insufficient to create a genuine issue as to whether Glock waived the written modification requirement and orally agreed that OMB could re-label LE pistols and sell them to the commercial market without prior written authorization. Defendants argue that Glock's waiver and oral agreement are evidenced by the fact that Glock delivered a label machine to OMB, trained OMB employees how to re-label guns, provided labels and associated software, and assisted OMB thereafter as re-labeled guns entered the markets. Defs.' Resp. Br. [Doc. 158-8] at 28. But all of this evidence is entirely consistent with the LE and Commercial Agreements' provisions that OMB could re-label guns only with Glock's

"written authorization." In fact, the evidence shows that OMB requested and received written authorization from Glock to divert 957 commercial pistols to the LE market and received a credit for the price difference. Glock's Facts [Doc. 153-1] ¶¶ 145-146. Thus, evidence that Glock provided OMB with the means to re-label guns does not support defendants' claim that Glock waived the written modification requirement and agreed to allow OMB to divert guns between markets as needed without obtaining Glock's prior written authorization.

The only other evidence supporting defendants' contention is the testimony of defendant Ralph that Glock VP Gary Fletcher orally agreed that OMB could re-label guns originally labeled for either the LE or commercial markets and deliver them to the other market to fill customers' orders as needed "without any conditions or additional verbal or written pre-approval requirements by Glock." Ralph Aff. [Doc. 160] ¶¶ 30, 33, 37. Fletcher denies that this ever occurred. Fletcher Dep. (Aff. of Scott C. Allan [Doc. 153-3], Ex. 21) at 18. This dispute, however, is immaterial. One party's unilateral testimony that the other party to a contract orally agreed to waive one of its terms, absent any evidence that the parties engaged in a mutual course of conduct evidencing such a waiver, is insufficient to create a genuine issue as

23

to whether a waiver occurred. *See Vratsinas*, 739 S.E.2d at 496 (evidence of waiver must be clear and unmistakable). As discussed above, defendants have produced no evidence that Glock engaged in a course of conduct evidencing a waiver of the original contracts' written modification requirement and the requirement that OMB obtain written authorization from Glock before diverting LE pistols to the commercial market. Therefore, Glock is entitled to summary judgment on its claim that OMB breached its agreements with Glock by diverting LE pistols and magazines to the commercial market without Glock's prior written authorization.

Defendants also dispute Glock's calculation of its damages. Defs.' Resp. to Glock's Facts (hereinafter, "Defs.' Resp.") [Doc. 158-1] ¶¶ 153-159. In support of its damages calculation, Glock has submitted thousands of pages of Glock and OMB invoices, purchase orders, and acquisition and disposition documents, together with purported summaries of these documents, which Glock asserts were prepared pursuant to Rule 1006 of the Federal Rules of Evidence. Glock's Facts [Doc. 153-1] ¶¶ 153-156, 159; Allan Aff. [Doc. 153-3] ¶¶ 69-70 & Exs. 68-69. Glock has also submitted a spreadsheet purportedly showing the price difference by model between LE pistols and commercial pistols. Glock's Facts [Doc. 153-1] ¶ 155; Allan Aff. [Doc. 153-3] ¶ 66 & Ex.

65. Defendants dispute the accuracy and reliability of Glock's summaries and spreadsheet. Defs' Resp. [Doc. 158-1] ¶¶ 153-155. For the following reasons, the Court concludes that the summaries and spreadsheet are inadmissible due to lack of a proper foundation. Therefore, Glock is not entitled to summary judgment as to the amount of damages it suffered as a result of OMB's breach.

Rule 1006 of the Federal Rules of Evidence provides in pertinent part as follows:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.

Fed. R. Evid. 1006. Rule 1006 imposes five requirements for the admission of summary evidence:

> (1) the underlying documents are so voluminous that they cannot be conveniently examined in court; (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place; (3) the underlying documents must be admissible in evidence; (4) the summary must be accurate and nonprejudicial; and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

*United States v. Moon*, 513 F.3d 527, 545 (6th Cir. 2008) (citation omitted).

25

Glock's summaries satisfy the first two requirements but not the last three. The documents underlying Glock's summaries are clearly voluminous, and defendants do not dispute that all the documents were made available to them for examination or copying at a reasonable time and place. However, Glock has presented no evidence establishing the admissibility of the underlying documents[5] or that the summaries are accurate and non-prejudicial. Finally, Glock has not presented the testimony of a witness who supervised the preparation of the summaries. In addition, the spreadsheet purportedly showing the price difference between LE and commercial pistols, although not submitted pursuant to Rule 1006, appears to summarize information from other documents and is therefore subject to Rule 1006's requirements. Even if not, it has not been properly authenticated and therefore is also inadmissible. *See* Fed. R. Evid. 901.

---

[5] Defendants have raised no objection to the admissibility of the underlying documents, and the documents would presumably qualify as business records under Rule 803(6) of the Federal Rules of Evidence. Nevertheless, the burden is on Glock to establish their admissibility. *See United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012).

AO 72A
(Rev.8/82)

2.    Specially Priced LE Pistols

OMB obtained certain LE pistols from Glock at prices reduced from Glock's list prices for such pistols on the basis of written and oral representations made to Glock by defendants ("Special Pricing Requests") that such pistols (or an equivalent number of the same model pistols) would be sold by OMB to specific law enforcement agencies at prices reduced from OMB's list prices for such pistols.  Glock's Facts [Doc. 153-1] ¶ 170; Am. Compl. [Doc. 90] ¶ 93; OMB's Answer [Doc. 99] ¶ 93; Ralph's Answer [Doc. 131] ¶ 93.[6]  Glock argues that when it agreed to OMB's requests for specially priced LE pistols and provided them at a discounted price, a valid contract was formed that required OMB to dispose of the specially priced LE pistols in the agreed manner.  Mem. of Law in Support of Mot. for Summ. J. [Doc. 153-2] at 12-13.  Glock alleges that OMB breached the contract by selling specially priced pistols to other purchasers instead of making a specific disposition of such pistols or transferring an equal number of the same model pistols to the specific law enforcement agency for which they were intended at the same special pricing.  Am. Compl. [Doc. 90] ¶ 192.  In support of its

---

[6] Because defendants admitted these allegations in their answers to Glock's amended complaint, the Court disregards their attempt to dispute these facts in response to Glock's Statement of Undisputed Material Facts.

27

motion for summary judgment on this claim, Glock submitted evidence purportedly showing that OMB did not transfer 6,078 specially priced LE pistols (or an equivalent number of the same model pistols) to the approved law enforcement agency, resulting in damages to Glock of $329,815 based on the difference between the standard LE price for which it would have sold the pistols to OMB and the lower special price. Glock's Facts [Doc. 153-1] ¶¶ 178-401.

In response, defendants do not dispute that they were contractually required to sell the specially priced LE pistols, or an equivalent number of the same model pistols, to the specific law enforcement agency for which they had been requested. Defendants argue, however, that Glock's evidence does not establish that they breached this requirement because OMB was often required to fill orders out of its general inventory before Glock ever shipped the specially priced pistols to OMB. Defs.' Resp. Br. [Doc. 158-8] at 20-21, 28-29; Ralph Aff. [Doc. 160] ¶ 86. Defendants also object to the standard prices used by Glock in calculating its damages. Defs.' Resp. [Doc. 158-1] ¶ 180. For the following reasons, the Court concludes that the evidence on which Glock relies is inadmissible. Therefore, Glock is not entitled to summary judgment on this claim.

To establish that OMB failed to transfer 6,078 specially priced LE pistols, or an equivalent number of the same model pistols, to the approved law enforcement agency, Glock relies on hundreds of pages of documents comprising (1) the Special Pricing Requests submitted to Glock by OMB, (2) OMB's purchase orders to Glock for the specially priced pistols, (3) Glock's invoices to OMB for the specially priced pistols, (4) OMB's invoices to the law enforcement agencies showing the number of specially priced pistols that were sold to them, and (5) a chart prepared pursuant to Rule 1006 of the Federal Rules of Evidence summarizing information from these documents and the standard price that OMB should have paid for these pistols ("Summary of Special Price Pistols"). Glock's Facts [Doc. 153-1] ¶¶ 178-401; Allan Aff. [Doc. 153-3] ¶¶ 87-91 & Exs. 86-90. As discussed above, summary evidence is admissible only if the proponent (1) establishes that the underlying documents are admissible and that the summary is accurate and reliable, and (2) presents the testimony of a witness who supervised the preparation of the summary. Glock has failed to satisfy any of these requirements with respect to the Summary of Special Price Pistols. In addition, the standard prices used in Glock's summary are based in part on the spreadsheet showing the price difference between LE and commercial

29

pistols, which the Court has already determined is inadmissible for failure to satisfy Rule 1006.  Glock's Facts [Doc. 153-1] ¶ 180.  Glock also cites over 3,500 pages of Glock invoices and OMB purchase orders, but it fails either to properly authenticate these documents or to specify where within these thousands of pages the support for the claimed standard prices can be found. *Id.* (citing Allan Aff., Exs. 66 & 67 [Docs. 153-46 through 153-53]). Consequently, the Court finds that the evidence submitted by Glock does not support entry of summary judgment on this claim.

> 3.  Sales Sample Pistols

Glock provides sales sample pistols to law enforcement distributors at a discounted price to be sent to law enforcement agencies for testing and evaluation purposes.  The order forms used to request sales sample pistols state that "[p]istols purchased under this program are to be used as Test & Evaluation pistols and must be retained through [the end of the year]."  Sales Sample Order Forms, Allan Aff. [Doc. 153-3] ¶ 92 & Ex. 91 [Doc. 153-72]. Glock claims that OMB breached this contractual requirement by ordering a large number of discounted sales sample pistols and then selling them during the same year rather than retaining them for testing and evaluation purposes.  Am. Compl. [Doc. 90] ¶ 193.

AO 72A
(Rev.8/82)

It is undisputed that for the years 2008, 2009, and 2010, OMB ordered and received a total of 1,335 sales sample pistols from Glock, and that it sold 1,330 of these pistols within the same year it received them instead of keeping them to send to law enforcement agencies for testing and evaluation purposes. Glock's Facts [Doc. 153-1] ¶¶ 414-415; Defs.' Resp. [158-5] ¶¶ 414-415. In support of its motion for summary judgment on this claim, Glock has submitted evidence purportedly showing that, based on the difference between the discounted price at which OMB ordered and received the sales sample pistols and the standard price OMB would have otherwise paid, OMB's breach caused Glock total damages of $50,785.40. Glock's Facts [Doc. 153-1] ¶¶ 421-438.

Defendants admit that sales sample pistols were required to be used for testing and evaluation purposes and could not be sold during the calendar year for which they were purchased. Ralph Dep., Vol. II [Doc. 153-11], at 55; Ralph's Resp. to Glock's Req. for Admis. Nos. 7-10 [Doc. 153-34]. However, defendants contend that, in the normal course of business, Glock did not require OMB to comply with these requirements. Ralph Dep., Vol. I [Doc. 153-10], at 175-76; Ralph's Resp. to Glock's Req. for Admis. Nos. 7-10 [Doc. 153-34]. Instead, defendants contend that, due to its delays in delivering

31

guns, Glock authorized OMB "to take guns out of its inventory to satisfy the customer, including the sales sample guns." Ralph Aff. [Doc. 160] ¶ 96.

This is essentially the same waiver argument that defendants made with respect to OMB's diversion of LE pistols to the commercial market, and it fails for the same reasons. The only evidence supporting Glock's alleged waiver is defendant Ralph's testimony that this "was the normal course of conduct of the parties." *Id.* ¶ 95. However, defendants have produced no evidence that Glock engaged in a course of conduct evidencing a waiver of the requirement that sales sample pistols be retained for a year and used only for testing and evaluation purposes. Defendant Ralph's testimony, standing alone, is insufficient to create a genuine issue as to whether Glock waived these important contract rights. *See Vratsinas*, 739 S.E.2d at 496 (evidence of waiver must be clear and unmistakable). Therefore, Glock is entitled to summary judgment on its claim that OMB breached its agreements with Glock by selling sales sample pistols during the same year they were received instead of retaining them for testing and evaluation purposes.

Defendants also dispute Glock's method of calculating its damages. First, defendants contend that by using serial numbers to track the disposition of sales sample guns, Glock failed to take into account the fact

that OMB often delivered sales sample guns from its regular inventory prior to receiving the sales sample guns it had ordered from Glock. Ralph Aff. [Doc. 160] ¶ 98. In support of this argument, defendants rely on a document entitled "Summary of Sales Sample," which purports to be a summary of OMB's invoices and acquisition and disposition records prepared pursuant to Rule 1006 of the Federal Rules of Evidence. *Id.*; Williams Aff. [Doc. 158-9] ¶ 44 & Ex. 42. However, as discussed above in connection with similar summaries submitted by Glock, the "Summary of Sales Sample" is inadmissible because defendants have not presented any evidence that the documents underlying the summary are admissible or that the summary is accurate and reliable, nor have they presented the testimony of a witness who supervised the preparation of the summary. Therefore, there is no evidence to support defendants' claim that Glock improperly calculated the number of pistols that OMB used for testing and evaluation purposes.

Defendants also dispute the standard prices used by Glock to calculate its damages. In support of these prices, Glock cites nearly a thousand pages of OMB purchase orders and over 2,500 pages of Glock invoices. Glock's Facts [Doc. 153-1] ¶¶ 422, 424, 426, 428, 429, 431, 433, 435, 437, 438 (citing Allan Aff., Exs. 66 & 67 [Docs. 153-46 through 153-53]). However, as noted

above, Glock fails either to properly authenticate these documents or to specify where within these thousands of pages support for the claimed standard prices can be found. *Id.* The Court concludes that this evidence is insufficient to establish the standard prices that OMB would have had to pay for the sales sample pistols. Therefore, Glock is not entitled to summary judgment as to the amount of damages it suffered as a result of OMB's breach.

### 4. Promotional Items

It is undisputed that Glock sold OMB various items of merchandise, such as clothing, bearing the federally registered Glock name and logo for purposes of resale. Ralph Dep., Vol. II [Doc. 153-11], at 76. It is also undisputed that, from time to time, OMB asked Glock to provide it with such merchandise free of charge with the understanding that it would be given away for promotional purposes. *Id.* at 77; Ralph Aff. [Doc. 160] ¶¶ 101-102. Although the parties did not enter into a written agreement regarding the disposition of promotional items, the evidence establishes that Glock offered to provide such items to OMB free of charge if they were given away for promotional purposes, and that OMB accepted this offer, thus creating a valid

and binding contract requiring such items to be given away rather than sold for profit.

Glock claims that OMB breached this agreement by selling such items for profit instead of giving them away for promotional purposes. Am. Compl. [Doc. 90] ¶ 194. In support of its motion for summary judgment, Glock has presented evidence purportedly showing that OMB received promotional items from Glock free of charge that had a value of at least $88,206.96, and that OMB sold these promotional items instead of giving them away. Glock's Facts [Doc. 153-1] ¶¶ 445-446.

In response, defendants rely upon the affidavit of defendant Ralph. Defs.' Resp. Br. [Doc. 158-8] at 23-24. In his affidavit, Ralph claims that OMB gave away the promotional items and did not profit from them unless expressly authorized by Glock.[7] Ralph Aff. [Doc. 160] ¶ 103. In his deposition, however, Ralph asserted his Fifth Amendment privilege and

---

[7] Defendants cite one instance in which Glock authorized OMB to sell Glock merchandise that had been provided free of charge as compensation for advertising costs. Ralph Aff. [Doc. 160] ¶ 100; Ralph Dep., Vol. II [Doc. 153-11], at 78-79. Glock admits that on this one occasion it gave OMB Glock-branded merchandise to sell for profit in lieu of advertising credit; however, these products are not included in the promotional items that Glock claims OMB should have given away for free. Glock's Resp. to Req. for Admis. No. 301 of OMB's Third Set of Req. for Admis., Williams Aff. [Doc. 158-9], Ex. 93.

35

refused to answer when asked how many promotional items OMB had put into inventory and sold for profit. Ralph Dep., Vol. II [Doc. 153-11], at 78. Ralph later admitted that he could not tell how much OMB had earned on promotional items that it should have been giving away. *Id.* at 82. As discussed above, Ralph may not assert his Fifth Amendment privilege in response to Glock's deposition questions and then offer affidavit testimony on the same subject in opposition to Glock's motion for summary judgment. *Zimmerman*, 854 F. Supp. at 899. Also, Ralph's assertion in his affidavit that OMB gave away the promotional items and did not profit from them contradicts, without explanation, his deposition testimony that he could not tell how much OMB had earned on promotional items that it should have been giving away. Therefore, his affidavit testimony cannot be used to create a genuine issue for trial. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). Therefore, Glock is entitled to summary judgment on its claim that OMB breached its agreement to give away promotional items that it received free of charge rather than selling them for profit.

Defendants also dispute the amount of damages claimed by Glock. The evidence submitted establishes the value of the promotional items that Glock

AO 72A
(Rev.8/82)

provided to OMB free of charge, and that OMB sold at least some of these promotional items for profit instead of giving them away. Glock's Facts [Doc. 153-1] ¶ 445 & Ex. 95 [Doc. 153-76]; Seymour Dep. [Doc. 153-16] at 103-04. However, the evidence does not establish that defendants sold all of the promotional items they received from Glock. The Court concludes that there is a genuine issue for trial as to how many of the promotional items defendants sold rather than giving away. Therefore, Glock is not entitled to summary judgment as to the amount of damages it suffered as result of OMB's breach.

B. Unjust Enrichment (Count II)

Since a valid contract existed with respect to the disposition of LE pistols and magazines, specially priced pistols, sales sample pistols, and promotional items, Glock is not entitled to summary judgment on its alternative claim for unjust enrichment. *See Smith v. McClung*, 452 S.E.2d 229, 232 (Ga. Ct. App. 1994) (theory of unjust enrichment applies when as a matter of fact there is no legal contract).

C. Fraud and Deceit (Count VI)

Glock alleges that defendants are liable for fraud and deceit because, when they placed orders for the diverted LE pistols and magazines, specially

37

priced pistols, sales sample pistols, and promotional items, they falsely represented that such pistols and magazines and promotional items would be sold (or given away) in accordance with the parties' agreements, that defendants knew these representations were false at the time they were made, and that Glock justifiably relied on these representations, resulting in damages to it. Am. Compl. ¶¶ 225-255. In response, defendants argue that there is a genuine issue for trial as to whether they had the requisite fraudulent intent not to comply with the parties' agreements at the time the alleged misrepresentations were made. For the following reasons, the Court concludes that there are genuine issues of material fact precluding summary judgment on this claim.

Generally, "actionable fraud cannot be predicated on a promise contained in a contract because the promise is to perform some act in the future, and normally, fraud cannot be predicated on statements which are in the nature of promises as to future events." *Gibson Technical Servs., Inc. v. JPay, Inc.*, 755 S.E.2d 377, 379 (Ga. Ct. App. 2014). "However, an exception to the general rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place." *Id.*

38

In support of its motion for summary judgment on this claim, Glock cites evidence purportedly showing that defendants fraudulently misrepresented their intent to dispose of the diverted LE pistols and magazines, specially priced pistols, sales sample pistols, and promotional items in the required manner in order to obtain them from Glock for less than they would normally pay. Glock's Reply Br. [Doc. 166] at 23 (citing Glock's Facts [Doc. 153-1] ¶¶ 147-152, 170, 174, 404, 406, 409, 412, 417, 420, 441-443, 448-451). After a careful review of this evidence, however, the Court finds that it fails to establish that defendants had the requisite fraudulent intent at the time they placed the orders with Glock. Therefore, Glock is not entitled to summary judgment on this claim.

First, much of the evidence cited by Glock does not relate to the issue of fraudulent intent at all. Glock's Facts [Doc. 153-1] ¶¶ 147-149, 170, 417, 420, 441-442, 448-451. Other evidence consists of nothing more than unsupported assertions in Glock's responses to defendants' interrogatories and in a Glock employee's deposition testimony. *Id.* ¶¶ 150, 174, 404, 443. In addition, Glock cites a number of vague email messages referring to the conversion of pistols, but none of these emails shows that defendants intended to convert the pistols at the time they were ordered. *Id.* ¶¶ 150-152.

Glock also cites a letter from OMB's general counsel, but the letter claims that the conversion of pistols was due to a "misunderstanding" rather than any fraudulent intent. *Id.* ¶ 151. Other evidence simply does not support Glock's assertion that orders were placed with fraudulent intent. *Id.* ¶¶ 406, 409, 412, 417, 420, 441-442, 448-451.

In addition, Glock cites evidence of the payments defendants made to Craig Dutton and Bo Wood, through their wives Lisa Dutton and Paula Wood, in exchange for favorable treatment. Glock's Reply Br. [Doc. 166] at 24 (citing Glock's Facts [Doc. 153-1] ¶¶ 79-128). Glock also cites evidence purportedly showing that the improper actions Dutton and Wood performed for defendants in exchange for these payments included covering up the fraudulent misrepresentations that defendants had made to Glock. *Id.* (citing Glock's Facts [Doc. 153-1] ¶¶ 81, 123-25, 127-28, 161-63, 174, 403, 443). Finally, Glock cites the fact that, when offered the chance to explain why the payments were made, Ralph refused to testify based on his Fifth Amendment privilege against self-incrimination. *Id.* at 24-25.

This evidence may be sufficient to establish that defendants paid kickbacks to Dutton and Wood in exchange for favorable treatment. However, it is not sufficient to establish that this favorable treatment

40

included covering up defendants' fraudulent intent when placing orders for LE pistols, specially priced pistols, sales sample pistols, and promotional items. First, much of the evidence cited by Glock relates to other forms of preferential treatment. Statement [Doc. 153-1] ¶¶ 123-125. Also, Glock again relies on unsupported assertions in its own interrogatory answers and Glock employees' deposition testimony, as well as vague and ambiguous email messages, none of which is sufficient to establish that Dutton and Wood were paid to cover up defendants' fraud. *Id.* ¶¶ 81, 127-128, 161-163, 174, 404, 443. Finally, the fact that Ralph refused to answer questions about these payments may support an adverse inference that the payments were kickbacks made to obtain preferential treatment, but this does not establish that the preferential treatment specifically included covering up defendants' alleged fraud.[8]

D.      Cybersquatting (Count VII)

Glock asserts a claim against defendants for alleged violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), known as the

---

[8] Ralph's subsequent guilty plea also does not establish that he was paying Dutton and Wood to cover up defendants' fraud. In his plea agreement, Ralph admits that he made the payments to Dutton and Wood "in exchange for favorable and preferential action," but the agreement does not otherwise specify the nature of this action. Plea Agreement [Doc. 175-1] § 2.A.ii.

Anticybersquatting Consumer Protection Act ("ACPA").  Under the ACPA, the owner of a mark has a cause of action against any person who, with bad faith intent to profit from that mark, registers a domain name that is, in the case of a mark that is distinctive, identical or confusingly similar to that mark; and in the case of a mark that is famous, is identical or confusingly similar to or dilutive of that mark.  15 U.S.C. § 1125(d)(1)(A).

Glock alleges that defendants violated the ACPA by each registering eight Internet domain names (sixteen in total) that are confusingly similar to and dilutive of the famous and distinctive "Glock" trademark. Am. Compl. [Doc. 90] ¶¶ 137-182, 257-264.  In support of its motion for summary judgment on this claim, Glock submitted evidence that it is the owner of a federal trademark registration for the word mark "GLOCK," that OMB and Ralph each registered eight Internet domain names containing the word "Glock" without notifying Glock or obtaining its permission, and that when accessed using the Internet each domain name would direct the user to OMB's website.  Glock's Facts [Doc. 153-1] ¶¶ 452-476.

In response, defendants do not dispute these facts.  Defs.' Resp. [Doc. 158-6] ¶¶ 452-476.  Instead, defendants argue that there is a genuine issue for trial as to whether they had the requisite bad faith intent to profit.  Defs.'

AO 72A
(Rev.8/82)

Resp. Br. [Doc. 158-8] at 35-36. In his affidavit, defendant Ralph claims that OMB never publicized or advertised the domain names, and that he believed their registration was a fair use because he and OMB received no sponsorship or revenues from the registered domain names and had no intent to harm Glock. Ralph Aff. [Doc. 160] ¶ 105. The Court finds that there is sufficient evidence to create a genuine issue for trial as to defendants' bad faith intent. Therefore, Glock is not entitled to summary judgment on this claim.

Glock cites the following statutory considerations as supporting a finding of bad faith:

> the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

and

> the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties.

15 U.S.C. § 1125(d)(1)(B)(i)(V) & (VIII). However, there is no evidence that defendants intended to divert consumers from Glock's online location to a site

43

"that could harm the goodwill represented by [Glock's] mark." Instead, it appears that defendants were attempting to divert customers to OMB's website simply in order to generate more sales of Glock products by OMB, which would benefit both OMB and Glock. Nor is there evidence that defendants' registration of multiple domain names was done "without regard to the goods or services of the parties." To the contrary, it seems clear that defendants registered the domain names because both Glock and OMB were in the business of selling Glock products, and defendants were hoping to increase their sales of such products for the mutual benefit of both parties.

Furthermore, the Court notes that "[s]ubjective determinations such as bad faith are singularly inappropriate for determination on summary judgment." *Tillery v. Leonard & Sciolla, LLP*, 521 F. Supp. 2d 346, 350 (E.D. Pa. 2007) (internal quotation marks omitted). Here, defendants have presented some evidence that they were acting in good faith and did not intend to harm Glock, and Glock has presented no evidence that it suffered any actual harm by reason of defendants' registration of the domain names. Under these circumstances, the Court finds that whether defendants were acting with the requisite bad faith intent to profit when they registered the domain names is a question for the jury.

44

E.   Federal Trademark Counterfeiting
     and Infringement (Count VIII)

Glock asserts a claim against defendants for alleged violation of Section

32 of the Lanham Act, 15 U.S.C. § 1114.  That statute provides in pertinent

part as follows:

> Any person who shall, without consent of the registrant . . . use
> in commerce any reproduction, counterfeit, copy, or colorable
> imitation of a registered mark in connection with the sale,
> offering for sale, distribution, or advertising of any goods or
> services on or in connection with which such use is likely to cause
> confusion, or to cause mistake, or to deceive . . . shall be liable in
> a civil action by the registrant . . . .

15 U.S.C. § 1114(1)(a).  Glock alleges that defendants violated this provision

by manufacturing, offering, distributing, and selling counterfeit merchandise

bearing Glock's federally registered trademarks without authorization from

Glock.  Am. Comp. [Doc. 90] ¶¶ 266-269.

In support of its motion for summary judgment on this claim, Glock

submitted evidence that the "Glock" and "Team Glock" stylized trademarks

(collectively, the "Glock Logos") are federal trademarks registered to Glock,

and that defendants manufactured and sold apparel using the Glock Logos

without Glock's permission.  Glock's Facts [Doc. 153-1] ¶¶ 477-481.  In

response, defendants do not dispute that they manufactured and sold apparel

45

using the Glock Logos, but they contend that Glock was fully aware and had given its approval of such use.  Defs.' Resp. [Doc. 158-6] ¶¶ 477-482.  The Court concludes that there are genuine issues of material fact  precluding summary judgment on this claim.

In his deposition, Ralph testified that OMB worked with Glock to come up with new ideas to enhance Glock's apparel line, and that at a national sales meeting in 2008 or 2009, Glock approved OMB's production of apparel with the Glock Logos, which OMB gave away and, after the Glock-OMB contracts were not renewed,  sold with Glock's express permission.  Ralph Dep., Vol. II [Doc. 153-11], at 92-94, 99-105; *see also* Ralph Aff. [Doc. 160] ¶ 15; Ralph's Answer to Interrog. No. 14 of Glock's First Set of Interrog. [Doc. 153-33]; Williams Aff. [Doc. 158-9], Ex. 95. The Court finds that this evidence is sufficient to create a genuine issue for trial as to whether Glock authorized defendants' production and sale of apparel bearing the Glock Logos.

F.     Violations of Georgia's RICO Act (Count IX)

Under Georgia's RICO Act, "[i]t is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." O.C.G.A.

§ 16-14-4(a). A "pattern of racketeering activity" means "at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions" that are interrelated. *Id.* § 16-14-3(8)(A). A "racketeering activity" is the commission, attempt, or solicitation or coercion of another to commit "any crime which is chargeable by indictment" under one or more specified state and federal laws. *Id.* § 16-14-3(9)(A) & (B).

Any person injured by reason of a violation of the Act "shall have a cause of action for three times the actual damages sustained and, where appropriate, punitive damages." O.C.G.A. § 16-14-6(c). To have standing to bring a civil action under this provision, "a plaintiff must not only show a pattern of racketeering activity, but also 'a direct nexus between at least one of the predicate acts listed under the RICO Act and the injury [the plaintiff] purportedly sustained.'" *Rosen v. Protective Life Ins. Co.*, 817 F. Supp. 2d 1357, 1381 (N.D. Ga. 2011) (quoting *Schoenbaum Ltd. Co. v. Lenox Pines, LLC*, 585 S.E.2d 643, 655 (Ga. Ct. App. 2003)). "To establish this nexus, the plaintiff must show that one of the predicate acts directly harmed it, not a third party." *Id.*

To make this showing, Glock relies on the conduct underlying its other claims. Specifically, Glock alleges that by perpetrating the alleged schemes

47

regarding the diverted LE pistols and magazines, specially priced pistols, sales sample pistols, and promotional items, defendants committed the crimes of theft by conversion and theft by deception in violation of O.C.G.A. §§ 16-8-4 & 16-8-3, which qualify as predicate acts under Georgia's RICO Act. Am. Compl. [Doc. 90] ¶¶ 280-293. In addition, Glock alleges that defendants' bribery and payment of kickbacks to Craig Dutton and Bo Wood constituted a scheme to deprive Glock of its intangible right to Dutton's and Wood's honest services in violation of 18 U.S.C. § 1346, and that defendants' mailing of checks and wiring of funds to Lisa Dutton and Paula Wood and their companies for such bribes and kickbacks constituted mail and wire fraud in violation of 18 U.S.C. §§ 1341 & 1343, all of which are predicate acts for purposes of Georgia's RICO Act. *Id.* ¶¶ 294-299. Finally, Glock alleges that by selling counterfeit goods bearing the Glock Logos, defendants violated 18 U.S.C. § 2320 relating to trafficking in goods or services bearing counterfeit marks, which also qualifies as a predicate act under Georgia's RICO Act. *Id.* ¶¶ 300-301.

In support of its motion for summary judgment on this claim, Glock relies on the evidence submitted in support of these underlying claims. For the following reasons, the Court concludes that this evidence is insufficient

48

to establish the required nexus between at least one predicate act and any injury purportedly sustained by Glock.  Therefore, Glock is not entitled to summary judgment on this claim.

First, ss discussed above, defendants are entitled to summary judgment on Glock's claims for theft by conversion and theft by deception, and there are genuine issues for trial as to whether defendants are liable for selling counterfeit goods bearing the Glock Logos.  Therefore, Glock is not entitled to summary judgment on its Georgia RICO Act claim based on these predicate acts.

As for the bribery/kickback scheme involving Craig Dutton and Bo Wood and the related crimes of mail and wire fraud, as discussed above in connection with Glock's fraud claim, the evidence does not establish that defendants' payments to Dutton and Wood were in exchange for their facilitating and/or covering up the alleged schemes to convert LE pistols, specially priced pistols, sales sample pistols, and promotional items. Therefore, insofar as Glock relies upon the damages caused by these alleged schemes to support its Georgia RICO Act claim, summary judgment is not warranted.

49

Finally, Glock also alleges that the kickbacks defendants paid to Dutton and Wood caused damage to Glock's reputation and distribution network. Glock's Facts [Doc. 153-1] ¶ 126. However, the only evidence cited in support of this claim is (1) Glock's unsupported assertion in response to one of Ralph's interrogatories, (2) Craig Dutton's assertion of his Fifth Amendment privilege in response to a series of questions about a distributor's complaints and the sending of so-called "sole source" letters, and (3) a letter from another Glock distributor raising a number of vague complaints. *Id.* (citing Glock's Answer to Interrog. No. 21 of Ralph's Second Set of Interrog. [Doc. 153-27]; Dutton Dep. [Doc. 153-12] at 141-43, 175-76; Allan Aff. [Doc. 153-3], Ex. 59). The Court finds this scant evidence insufficient to establish as a matter of law that Glock suffered damage to its reputation and distribution network as a result of defendants' payments to Dutton and Wood.

G.     Punitive Damages and Attorneys' Fees

Glock seeks an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1(b) in connection with its claims for theft by conversion, theft by deception, and fraud and deceit, and pursuant to O.C.G.A. § 16-14-6(c) in connection with its Georgia RICO Act claim. Summary judgment is inappropriate on this claim for two reasons. First, since the Court has

50

concluded that defendants are entitled to summary judgment on the theft by conversion and theft by deception claims, and that genuine issues remain for trial on the fraud and deceit claim and the Georgia RICO Act claim, there is no basis for an award of punitive damages at this time. Second, even if Glock were entitled to summary judgment on one or more of its underlying tort claims, only the jury could determine whether Glock was entitled to punitive damages and, if so, in what amount. *See Covington Square Assocs., LLC v. Ingles Mkts., Inc.*, 686 S.E.2d 359, 363-64 (Ga. Ct. App. 2009).

Glock also seeks an award of its expenses of litigation, including reasonable attorneys' fees, pursuant to provisions in the LE and Commercial Agreements; Georgia's RICO Act, O.C.G.A. § 16-4-6(c); and the Lanham Act, 15 U.S.C. § 1117. Any entitlement to an award of such fees and expenses will be determined after trial and entry of final judgment in accordance with the procedures set out in Local Rule 54.2.

H.   OMB's Counterclaim

In Count I of its counterclaim, OMB alleges that Glock breached the 2010 LE Agreement by unilaterally restricting OMB's geographic territory to less than the entire United States. Countercl. [Doc. 99] ¶¶ 2-7. Section 24 of the 2010 LE Agreement, under the heading "Territory," provides: "The

51

DISTRIBUTOR's limited territory will consist of the area(s) described below: NATIONAL ACCOUNT." Compl. [Doc. 1], Ex. 1-C.  In support of its claim that Glock breached this provision, OMB relies on defendant Ralph's affidavit, in which he states that, "inexplicably and contrary to the 2010 Agreement, GLOCK told OMB it was unilaterally reducing OMB's territory." Ralph Aff. [Doc. 160] ¶ 107.

Glock denies that it unilaterally reduced OMB's territory.  Glock's Facts [Doc. 153-1] ¶¶ 487-495.  OMB disputes this.  Defs.' Resp. [Doc. 158-6] ¶¶ 488-496.  Regardless, Glock contends that it is entitled to summary judgment because OMB has no evidence that it suffered any damages as a result of Glock's alleged reduction of its territory.  Glock's Facts [Doc. 153-1] ¶ 502.  OMB does not dispute that it suffered no damages as a result of Glock's alleged breach.  Defs.' Resp. [Doc. 158-6] ¶¶ 502-503.[9]  Nevertheless, possible recovery of nominal damages to cover the cost of bringing the action is sufficient to preclude summary judgment on a claim for breach of contract if the plaintiff can establish a genuine issue of fact as to liability.  O.C.G.A.

---

[9] Because of a numbering error, paragraph 502 of defendants' response actually responds to paragraph 501 of Glock's Facts, while paragraphs 503 and 504 both respond in identical fashion to paragraph 503 of Glock's Facts.  Thus, defendants fail to respond at all to paragraph 502 of Glock's Facts, which asserts that OMB has no damages.

AO 72A
(Rev.8/82)

§ 13-6-6; *Poe v. Sears, Roebuck & Co.*, 1 F. Supp. 2d 1472, 1477 (N.D. Ga. 1998). Therefore, Glock is not entitled to summary judgment on this ground.

Glock argues that it is also entitled to summary judgment on this claim because it had the right to terminate the LE Agreement upon thirty days written notice or at any time due to OMB's breach of any of the covenants and conditions or any of its obligations under the contract. Because it is undisputed that Glock could have cancelled the 2010 LE Agreement in its entirety, Glock argues that it could have also cancelled OMB's alleged right to sell LE pistols in certain states or territories. Glock, however, cites no authority for the proposition that a right to unilaterally terminate an agreement includes the right to breach any of its provisions prior to termination. Unless and until Glock exercised its right to terminate the 2010 LE Agreement, the contract remained in full force and effect and Glock was required to comply with its provisions. Therefore, Glock is not entitled to summary judgment on this ground.

Count II of OMB's counterclaim alleges that Glock breached a Letter of Understanding entered into on March 2, 2011, following Glock's decision not to renew the LE and Commercial Agreements for 2011. Countercl. [Doc. 99] ¶¶ 8-12. The Letter of Understanding provided that Glock would honor

quotes for Glock products submitted to law enforcement agencies by OMB on or before December 31, 2010, subject to OMB's fulfillment of certain specified conditions. Allan Aff. [Doc. 153-3], Ex. 103 [Doc. 153-82]. The quotes that remained outstanding were identified as the "Pending Quotes" and listed on an attached exhibit. *Id.* Glock contends that it is entitled to summary judgment on this claim because OMB has produced no evidence that Glock failed to honor any of the Pending Quotes where OMB met the requirements set forth in the Letter of Understanding. Glock's Mem. of Law in Support of Mot. for Summ. J. [Doc. 153-2] at 30-31; Glock's Facts [Doc. 153-1] ¶¶ 512-513.

In response, OMB has not identified any of the Pending Quotes that Glock failed to honor. Instead, OMB claims that the Letter of Understanding "was not limited to" the Pending Quotes. Defs.' Resp. [Doc. 158-6] ¶ 514. In addition, OMB claims that Glock "has refused to honor OMB's prior commitments in violation of the express terms of agreements the parties entered into prior to the Letter of Understanding." Ralph Aff. [Doc. 160] ¶ 114. Specifically, OMB cites Glock's non-renewal letter dated January 3, 2011, which stated: "In the event you have contracts with specific agencies for delivery of GLOCK products beyond 31-Dec-2010, we will make special

arrangements for these orders." Defs.' Resp. [Doc. 158-6] ¶¶ 504-514;
Williams Aff. [Doc. 158-9], Ex. 48.

OMB's arguments are without merit. As this Court previously held:
"By its plain terms, the March 2011 letter agreement applies only to the
Pending Quotes." Order of May 5, 2014 [Doc. 157] at 6. Glock's statement in
its January 3, 2011, non-renewal letter that it would "make special
arrangements" in the event OMB had contracts with specific law enforcement
agencies for delivery of Glock products beyond December 31, 2010, is too
vague and indefinite to create an enforceable contract. In any event, OMB's
counterclaim asserts a claim for breach of the Letter of Understanding, not
any prior agreement. Since OMB has presented no evidence that Glock failed
to honor any of the Pending Quotes where OMB satisfied the requirements
set forth in the Letter of Understanding, there is no evidence of a breach.
Therefore, Glock is entitled to summary judgment on this claim.

Summary

For the foregoing reasons, the Court DENIES defendants' motion to
strike [Doc. 167], DENIES defendants' motion to set time certain deadline for
providing amended responses and motion to defer ruling on pending motions
[Doc. 175], GRANTS defendants' motion for partial summary judgment [Doc.

55

152], and GRANTS IN PART AND DENIES IN PART plaintiff's motion for summary judgment [Doc. 153]. Counts III, IV, and V of Glock's amended complaint and Count II of OMB's counterclaim are DISMISSED WITH PREJUDICE. The parties' proposed consolidated pretrial order is due thirty (30) days from the date of entry of this order. LR 16.4A, NDGa.

IT IS SO ORDERED, this ____ day of March, 2015.

_____
Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia